STATE OF NEBRASKA, APPELLEE, V. JOHN W. SCHOTT, APPELLANT.

384 N.W.2d 620

Filed April 4, 1986.    No. 85-313.

Cunningham, Blackburn, VonSeggern, Livingston & Francis, for appellant.

Robert M. Spire, Attorney General, and Dale D. Brodkey, for appellee.

Krivosha, C.J., Boslaugh, White, Hastings, Caporale, and Shanahan, JJ.

Shanahan, J.

A jury in the county court for Polk County convicted John W. Schott of two counts of cruelty to animals in violation of Neb. Rev. Stat. § 28-1002 (Reissue 1979). Schott appealed his conviction and sentence to the district court, which affirmed Schott's conviction but modified the sentence imposed by the county court. We affirm in part and in part reverse and remand for further proceedings.

The complaint filed against Schott charged him with two counts of cruelty to livestock in the winter of 1983-84.

Section 28-1002 provides in part:

(1) A person commits cruelty to animals if, except as otherwise authorized by law, he intentionally or recklessly:

(a) Subjects any animal to cruel mistreatment; or

(b) Subjects any animal in his custody to cruel neglect

. . . .

Statutory definitions applicable to the charges against Schott are:

(2) Cruel mistreatment shall mean every act or omission which causes, or unreasonably permits the continuation of, unnecessary or unjustifiable pain or suffering;

(3) Cruel neglect shall mean failure to provide food, water, protection from the elements, opportunity to exercise, or other care normal, usual, and proper for an animal's health and well-being . . . .

Neb. Rev. Stat. § 28-1001 (Reissue 1979).

Schott, 49, has raised cattle and hogs for 30 years and conducted his livestock operations on a 400-acre tract 5 miles from his residence near Osceola. That tract included a 185-acre pasture of native grasses and buildings for hogs. In the autumn of 1983 Schott had to supplement his pasture because cattle had grazed to the point that the grasses were "short," approximately 1 inch. On the weekend after Thanksgiving

1983, a blizzard struck Schott's operations. Between Thanksgiving and January 1984, according to Schott, 10 of his hogs and 34 head of cattle died.

On December 9, 1983, Timothy Siemek, Polk County sheriff, received a telephone call from one of Schott's neighbors, informing the sheriff that several dead or starving cattle were visible from the county road near Schott's pasture. From the road at Schott's livestock operations, Sheriff Siemek saw two cattle carcasses in the pasture, contacted Schott, and asked about his care given to the cattle. Schott responded that he was taking care of his livestock with daily watering and feeding, although he was having trouble with snowmobilers on his property. As Sheriff Siemek and a deputy drove past Schott's pasture and hog facility on December 12, they saw four dead cattle, including two carcasses which had been observed on December 9. The sheriff, in the company of his deputy and Schott, who had consented to the entry, went into the pasture, where there were eight or nine cattle carcasses and a cow alive but "extremely thin and boney." A frozen pond was the only water supply. No action was taken until a neighbor's second complaint on December 19, after which the sheriff again contacted Schott about care of his cattle. Schott said he would have the cattle removed to a commercial feedlot.

After another neighbor's complaint, this time about Schott's hogs, on January 11 the sheriff paid his third visit to Schott's, where he saw two dead cattle near a driveway and some "very thin" hogs. Siemek directed Schott to "dispose of the hogs or move them back to his home place where he could take better care of them." When Siemek drove by the livestock area on January 23, he neither saw nor heard hogs on the place. With a search warrant and Dr. James Varney, a local veterinarian, Sheriff Siemek went to Schott's cattle and hog operation on January 25, entered the pasture, discovered 40 dead cattle, with "very thin, skin . . . pulled tight [with] pin bones . . . very noticable [sic] in the larger cattle." Cedar trees in the pasture were "devoid of any foliage" and had "no needles, cedar needles," to a height of 6 feet. Thorny gooseberry bushes, normally 3 to 4 feet tall, were eaten to a height of 1 foot. There were no cattle alive. While inspecting buildings used for hogs,

Siemek found four dead hogs in one building, three other carcasses in a second building, no food in the feeders, no bedding for the hogs, and partially eaten hog carcasses. One hog was eating the remnants of another hog. On later inquiry by the sheriff, Schott said that several hogs had died after they had fallen from an elevated feeding platform and were unable to reach food.

With another search warrant Sheriff Siemek returned to Schott's on January 26. Accompanying the sheriff were an investigator for the Nebraska Brand Committee, Dr. Varney, and two additional veterinarians, Dr. Alan Doster and Dr. Rodney Moxley, both professors in the College of Agriculture at the University of Nebraska-Lincoln.

Dr. Doster, a veterinarian-pathologist, was called upon to perform necropsies on the animals. A necropsy is the "animal term for autopsy," or a post mortem examination to determine the cause of an animal's death. During necropsies, Dr. Varney used a stick to drive off hogs trying to eat the organs eviscerated from the "posted" animals. Necropsies disclosed that some hogs had empty stomachs except for feces which had been eaten. There was no running water or bedding, and the depth of manure was 6 inches at the hog facilities. The ribs on cattle carcasses protruded "very much." Tree branches had been eaten to a height of 5 or 6 feet above ground. Cedar branches had been eaten—an extraordinary occurrence. Because cedars have aromatic hydrocarbons, such as those found in turpentine, "animals will not eat cedar trees unless they absolutely have to." The contents of rumen (the first compartment of a bovine stomach) usually have the "consistency of watery oatmeal," but in the carcasses at Schott's the rumen contents were "all balled up," an indication of dehydration. Dr. Doster concluded that Schott's "animals had been suffering from malnutrition; and, probably had died as a result of malnutrition, coupled with the weather, management procedures, and also the lack of water." As explained by Dr. Doster, animals need a greater quantity of food during cold weather in order to generate and maintain energy for suitable body temperature. Cold weather produces an increase in an animal's appetite and a decrease in the animal's efficiency in converting food into energy.

Malnutrition causes pain to animals. When Schott's animals were deprived of sufficient food, water, care, and shelter, the extreme cold weather brought "everything to an apex and killed these animals." Normal death loss, under weather conditions prevailing when Schott's livestock died, was less than 3 percent. Death loss at more than 3 to 4 percent indicated "there is something wrong."

Dr. Rodney Moxley, a diagnostic veterinarian, found nothing toxic or infectious as a result of necropsies. Intestinal tracts of the cattle carcasses were "devoid of food contents." Dr. Moxley noted carcasses in a state of "sternal recumbency"—an animal's position on the ground with its chest "straight up and down" and its "hind limbs pointing straight backwards, where the knees of the hind legs were behind" the animal. Such position is attributable to weakness preventing the animal from getting its "legs up underneath them." Dr. Doster had also observed that state in the carcasses of Schott's cattle and recognized such position as one of the characteristics of cattle death by starvation. Having seen hogs "cannibalizing carcasses" of dead swine at Schott's, Dr. Moxley testified: "Cannibalism in swine occurs with pica or abnormal appetite" which "comes about when there is starvation." According to Dr. Moxley, the cause of death for Schott's cattle was "emaciation" as a result of an "inadequate food supply." Absence of food produces abdominal cramping and pain in animals.

Dr. Ernest R. Peo, Jr., a professor of animal science at the University of Nebraska-Lincoln, characterized "animal husbandry" as management, feeding, and care of animals. In Dr. Peo's opinion Schott had not adhered to proper animal husbandry regarding his cattle and swine, and the animals were "grossly deficient in energy nutrition." If swine are not well fed, they will eat the carcasses of dead animals and feed on feces. In his 28 years' experience Dr. Peo had never seen malnutrition and dehydration to the extent found in Schott's livestock.

According to Dr. Varney, the local veterinarian, Schott's livestock died from "a combination of malnutrition and dehydration, with subzero temperatures exacerbating the situation." A neighbor and commercial cattle feeder saw some

of Schott's cattle dead during the cold weather and "curled around the trees . . . it was a sin to see it."

Climatological data reflected a severe winter in the Osceola area, including 13 inches of snow on November 29, the Tuesday following Thanksgiving, and a low temperature of -23 °F on December 22.

A veterinarian with the diagnostic laboratory of Kansas State University testified for Schott and expressed an opinion that the cause of death of Schott's livestock was a "limited state of nutrition" before the severe weather in November, that Schott's inability to feed his livestock "initiated the demise of [Schott's] cattle," and that "the severe weather had a great deal to do with the loss of the swine."

Before arrival of Sheriff Siemek and the veterinarians on January 26, Schott had taken 97 head of cattle to a local commercial feeder, who testified 13 of Schott's dehydrated cattle died in the first 4 days after delivery to the feedlot.

Schott's defense was based on the extreme weather conditions which, he claimed, prevented appropriate attention to his livestock and, therefore, resulted in their death. Schott testified about his difficulties in taking feed to his livestock. The blizzard had prevented Schott's going to his livestock operations for 3 days. Schott provided water by daily breaking two holes in the ice on the pond, but the water froze shortly after each opening. According to Schott, weather conditions hindered his care for his livestock. Although Schott knew several of his cattle had died in the first few weeks of December and realized his cattle were not "eating well" and "lacked enthusiasm," he never called a veterinarian.

The jury returned a verdict of guilty on each count of cruelty to animals. Schott appealed to the district court.

The trial lasted 4 days. The bill of exceptions includes 551 pages of testimony and 96 exhibits, including Sheriff Siemek's 36 color photographs of Schott's facilities, dead cattle in the pasture, gaunt or dead hogs, and cannibalized carcasses of livestock. Dr. Doster presented 41 color slides in conjunction with his testimony. We have examined and reviewed all the record.

Four of Schott's five assignments of error question the

quantity of evidence; for example, insufficient evidence to submit the case to the jury, to support the verdict, and, as a matter of law, to establish guilt beyond a reasonable doubt.

*Intentionally* means willfully or purposely, and not accidentally or involuntarily. *State v. Coca,* 216 Neb. 76, 341 N.W.2d 606 (1983).

By statute, as a part of the criminal code of Nebraska,

Recklessly shall mean acting with respect to a material element of an offense when any person disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

Neb. Rev. Stat. § 28-109(19) (Reissue 1979).

"The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident." *State v. Thielen,* 216 Neb. 119, 125, 342 N.W.2d 186, 191 (1983).

In determining whether evidence is sufficient to sustain a conviction in a jury trial, this court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury—all of which is within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. See, *State v. Joy,* 220 Neb. 535, 371 N.W.2d 113 (1985); *State v. Goodon,* 219 Neb. 186, 361 N.W.2d 537 (1985); *State v. Thielen, supra.*

We reaffirm the rule: "One accused of a crime may be convicted on the basis of circumstantial evidence if, taken as a whole, the evidence establishes guilt beyond a reasonable doubt. The State is not required to disprove every hypothesis but that of guilt." *State v. Buchanan,* 210 Neb. 20, 28, 312 N.W.2d 684, 689 (1981); *State v. Piskorski,* 218 Neb. 543, 357 N.W.2d 206 (1984).

There is sufficient evidence to support a verdict that Schott intentionally or recklessly subjected his livestock to cruel mistreatment or subjected his custodial animals to cruel neglect. We will not interfere with a guilty verdict based on evidence, unless that evidence, so lacking probative force, is insufficient to support a verdict beyond a reasonable doubt. *State v. Joy, supra.* The evidence in this case spoke of two Schotts. The first Schott was intentionally or recklessly cruel to his livestock. The second Schott, hindered by weather, was prevented from caring for his animals. As reflected by the verdict, the jury did not hear the second Schott. Judgment of Schott's conviction is affirmed.

Schott's second assignment of error is an allegation that the district court abused its discretion by imposition of an excessive sentence.

After Schott's conviction the county court sentenced him to probation and ordered, inter alia, that Schott pay a $750 fine on each of the two counts; that Schott not purchase, possess, or raise livestock for 6 months, after which any livestock operations would be subject to inspection by the probation officer and a veterinarian; that Schott complete 24 hours of college credit concerning animal husbandry; and that Schott be imprisoned for 30 days in the county jail, such sentence to be served in three intervals of 10 days each commencing on February 1 and June 1, 1985, and on February 1, 1986. Sentence to the county jail "may be waived by the Court upon good cause shown, and at the discretion of the Court prior to each jail term."

Each crime of which Schott has been convicted is a Class II misdemeanor punishable by imprisonment for a maximum term of 6 months, a maximum fine of $1,000, or both such imprisonment and fine. No minimum penalty is specified. See Neb. Rev. Stat. § 28-106 (Cum. Supp. 1984).

Upon Schott's appeal the district court found and ordered as follows:

Time, from and after the date of sentencing in the Trial Court, has revealed additional information to this Court on Appeal which demands, for the good of both John Schott and the State of Nebraska, that the Trial Court's

sentence be modified.

Therefore, Mr. Schott is sentenced to be incarcerated in the County Jail for thirty days on Count I and for 30 days on Count II (sentences to be served concurrently) and is ordered to pay the costs herein.

Appeals in criminal cases tried in a county court are governed by Neb. Rev. Stat. § 29-613 (Reissue 1979) and are restrictively disposed on the basis of the record made in the county court. See *State v. Clark*, 194 Neb. 487, 233 N.W.2d 898 (1975).

"The district court shall hear and determine any cause brought by appeal from a county or municipal court upon the record, and may affirm, modify, or vacate the judgment, or may remand the case to the county or municipal court for a new trial." § 29-613.

In all cases other than appeals from the Small Claims Court, the district court shall review the case for error appearing on the record made in the county . . . court. The district court shall render a judgment, which may affirm, affirm but modify, or reverse the judgment or final order of the county . . . court. If the district court reverses, it may enter judgment in accordance with its findings, or remand the case to the county . . . court for further proceedings consistent with the judgment of the district court.

Neb. Rev. Stat. § 24-541.06 (Cum. Supp. 1982).

A district court's review of criminal cases tried in a county court is limited to an examination of the record for error or an abuse of discretion which occurred in the county court. See *State v. Smith*, 199 Neb. 368, 259 N.W.2d 16 (1977).

A district court may modify a sentence imposed by a county court only where the county court has so abused its discretion as to render its sentence an error upon the record presented. *State v. Olson*, 217 Neb. 130, 347 N.W.2d 862 (1984).

The district court in this case, in its appellate jurisdiction and review of county court proceedings, did not determine there had been an abuse of discretion by the county court in imposing an otherwise permissible sentence authorized by law. By the district court's considering "additional information," we can

only construe the district court's action as a de novo disposition of the question raised regarding Schott's sentence, a disposition inconsistent with the statutes governing appeals from a county court in criminal cases. Therefore, the judgment of the district court regarding Schott's sentence is reversed. This matter is remanded to the district court for further proceedings regarding the county court's sentence imposed on Schott.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

BOSLAUGH, J., concurs in the result.