STATE OF NEBRASKA, APPELLEE, V. ROLAND L. FLEMING,
APPELLANT.

388 N.W.2d 497

Filed June 13, 1986.   No. 85-523.

William G. Line of Kerrigan, Line & Martin, for appellant.

Robert M. Spire, Attorney General, and Melvin K. Kammerlohr, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Roland L. Fleming appeals his convictions in a jury trial for three counts of theft, namely, obtaining property of another by deception in violation of Neb. Rev. Stat. § 28-512 (Reissue 1985). We affirm the judgment of the district court for Dodge County.

Section 28-512 provides in pertinent part as follows:

A person commits theft if he obtains property of another by deception. A person deceives if he

intentionally:

(1) Creates or reinforces a false impression, including false impressions as to law, value, intention, or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;
. . .

. . . .

The word deceive does not include falsity as to matters having no pecuniary significance, or statements unlikely to deceive ordinary persons in the group addressed.

Neb. Rev. Stat. § 28-509 (Reissue 1985) provides in part:

(4) Obtain shall mean:

(a) In relation to property, to bring about a transfer or purported transfer of a legal interest in the property, whether to the obtainer or another; . . .

. . . .

(5) Property shall mean anything of value . . . .

(6) Property of another shall mean property in which any person other than the actor has an interest which the actor is not privileged to infringe . . . .

Fleming, an independent insurance agent, lived in and worked out of a motel room in Fremont. In January 1984 Fleming was contacted by Ghassan Abdallah, an independent insurance agent who had organized a network of 50 "direct writing agents" for some 10 or 12 insurance companies, an operation conducted from Abdallah's home in Iowa. Abdallah, who had previously worked with Fleming, inquired whether Fleming would be interested in selling insurance for Arcadia National Life Insurance Company. Fleming eventually agreed to sell insurance for Arcadia, and on January 27 signed a general agent's contract which provided in part: "The Agent shall immediately remit to the Company all premiums collected by him."

In April 1984 Fleming conferred with Stella and Louis Leifert regarding Arcadia's medicare supplemental insurance. Fleming had previously sold Leiferts a policy issued by another insurance company and often visited Leiferts on a social basis, when Leiferts and Fleming "had coffee and cookies together

many times." Leiferts "thought a lot of [Fleming]," "trusted him completely," and considered him a "good friend." Fleming never delivered an Arcadia policy to Leiferts but "explained everything about the policy" Leiferts would be receiving and gave them a brochure describing the Arcadia coverage. Leiferts agreed to purchase Arcadia's policy, and Fleming prepared a check made payable to himself for $690.56, which check was signed by Stella. When asked why the check was made payable to himself, Fleming responded that "Arcadia gave him orders that he could make the checks to himself for himself." Fleming promptly deposited the check in his personal checking account.

Shortly after his meeting with Leiferts, Fleming approached Leiferts' neighbors, Margaret and Leo Buse, who had learned about the Arcadia coverage through Leiferts. Fleming showed Buses Arcadia's brochure, explained the insurance coverage to them, and described "the deal." When Buses agreed to purchase Arcadia's policy for medicare supplemental coverage, Fleming prepared a check made payable to himself for $1,328. Leo Buse signed the check, which Fleming deposited in his personal account. When Leo Buse later tried to find out why Arcadia's policy had not been delivered to Buses, Fleming "tried to ignore" Leo Buse and offered the explanation that Arcadia was "setting up another office in Omaha." Still later, when Margaret broke her arm and Buses submitted a claim on Arcadia's coverage, Fleming put the claim papers "in his suitcase." However, Buses "never heard no more" about Margaret Buse's claim for her broken arm.

In November 1984, although Leiferts had never received an Arcadia policy, Fleming contacted Leiferts for renewal of coverage with Arcadia. On Fleming's assurance that they had coverage with Arcadia, Leiferts agreed to renew their policy, and Louis signed a check for $1,328 prepared by and made payable to Fleming. Fleming also deposited this check in his personal account.

When neither Leiferts nor Buses received an insurance policy by December 1984, Fleming assured the couples the Arcadia policies were forthcoming, stating that there had been a delay in the delivery of the policies because Arcadia was "merging with another company." Shortly thereafter, Leiferts attempted to

make a claim under their Arcadia policy. Although Fleming told Louis Leifert "you'll have your money" in 2 weeks, Leiferts never received payment on their claim.

Leiferts and Buses eventually contacted local law enforcement. A subsequent investigation revealed that Fleming had not received a commission for the sale of Arcadia insurance and had never contacted the company "in regard to any [insurance customer]." Arcadia's records did not show "any applications or payments of an initial premium" by Leiferts or Buses. According to bank records, Fleming had not written any checks to Arcadia regarding coverage for Leiferts or Buses. On February 11, 1985, the State filed an information charging Fleming with three counts of theft by deception (§ 28-512) pertaining to the events surrounding Leiferts' purchase of the Arcadia policy (count I), Buses' purchase of the Arcadia policy (count II), and Leiferts' renewal of their Arcadia policy (count III).

Fleming's trial commenced on April 18, 1985. Both Leiferts and Buses described the events surrounding their presumed purchase of insurance coverage from Arcadia through Fleming. A custodian of records at Fleming's bank testified the checks from Leiferts and Buses had been deposited in Fleming's personal account. Finally, one of Arcadia's representatives, who was "connected" with issuing that company's policies, testified Arcadia had no record of the alleged sale of insurance to Leiferts and Buses. Referring to the contract signed by Fleming, Arcadia's representative further testified that an Arcadia agent had no authority to "accept payments of premiums in his own name."

Fleming's defense focused on Abdallah's role in processing insurance applications. Fleming testified that Abdallah frequently visited Fleming's motel room in Fremont to collect insurance applications and premiums paid for insurance sold by Fleming. In particular, Fleming testified that Abdallah had collected "both the application and premium" for Leiferts' and Buses' insurance with Arcadia. Fleming also testified that Abdallah had authorized him to accept premium payments in Fleming's name. All Fleming's records, as agent in the sale to Leiferts and Buses, were kept in Fleming's briefcase, which

"disappeared somehow."

Fleming called three witnesses, who generally corroborated his assertion that Abdallah had visited Fleming at his Fremont motel room. One witness had a prior felony conviction which was brought to the jury's attention. Another witness had been convicted of the misdemeanor offense of issuing a bad check. See Neb. Rev. Stat. § 28-611(1)(c) and (d) (Reissue 1985) (issuing a bad check is a Class I misdemeanor "if the amount of the check or order is seventy-five dollars or more, but less than three hundred dollars" and a Class II misdemeanor "if the amount of the check or order is less than seventy-five dollars"). During cross-examination of this witness, the State, over Fleming's objection, raised the witness' prior misdemeanor conviction for the bad check.

In rebuttal, the State called Abdallah, who testified that he had never been to Fleming's motel in Fremont, had never received any documents from Fleming, and had never authorized that premiums be paid to Fleming in his own name.

Fleming had intended to call a fourth witness, Swessinger, to substantiate Abdallah's presence in Fremont. Swessinger, a resident of Fremont, had told Fleming's counsel "a few months" before trial that he would be traveling, for a short period, to Rapid City, South Dakota. At some undisclosed date before trial, however, the witness informed Fleming's lawyer that he would not be able to attend the trial. On the day before trial Fleming filed a "MOTION TO TAKE DEPOSITION OF WITNESS OR IN THE ALTERNATIVE TO ADJOURN THE TRIAL FOR THE PURPOSE OF SECURING THE TESIMONTY [sic] OF A WITNESS," asking, in effect, that the court grant a continuance so that Fleming could obtain Swessinger's deposition or a postponement until Swessinger could personally attend the trial. That motion, in the form of Fleming's affidavit, stated that Swessinger had "advised" Fleming that he "suffers from edema as a result of pneumonia and his doctor has forbidden him to travel for at least a one week period." The motion also stated that Swessinger would "testify that he personally met Abdallah in [Fleming's] quarters in Fremont."

During argument on the motion, Fleming's counsel conceded

that Swessinger's "treating physician" had "not forbidden [Swessinger] to travel" and that Swessinger was "not completely accurate" in his communications with Fleming. According to Fleming's counsel, Swessinger would contradict Abdallah's testimony that he had never been at Fleming's motel room in Fremont. When the court specifically asked the reason that Swessinger could not travel from South Dakota to attend the trial, Fleming's counsel responded that Swessinger was "not up to making the drive" and was "not crazy about flying." Fleming's lawyer remarked that one of Fleming's witnesses had a prior felony conviction, and stated that Swessinger "to my knowledge has never been convicted of any felony." The court refused to grant a continuance and overruled the motion, stating, "I don't think the witness wants to be here."

The jury returned a verdict of guilty on all three counts. On May 20, 1985, the court sentenced Fleming to consecutive terms of 1 year under count I and 1 to 3 years on the remaining two counts.

Fleming contends the district court erred in (1) failing to find that the evidence was insufficient to sustain a conviction for theft by deception, (2) allowing the State to ask Fleming's witness whether she had been convicted of writing insufficient-fund checks, and (3) refusing to grant a continuance allowing Fleming to secure the testimony of the out-of-state witness. Fleming also challenges the constitutionality of Neb. Rev. Stat. § 28-510 (Reissue 1985) (consolidation of theft offenses).

Fleming maintains that the evidence does not support a finding that he obtained property *by deception*, as required by § 28-512, and contends the State "utterly failed to prove any deceptive statement" made to either Leiferts or Buses sufficient to induce the couples to part with their property. Brief for Appellant at 8. Fleming, in effect, argues that § 28-512 requires an express misrepresentation of a material fact.

Fleming misconstrues the language of § 28-512. In *State v. Wellington*, 34 Wash. App. 607, 663 P.2d 496 (1983), a Washington appellate court, construing a provision similar to § 28-512, noted: "The plain language of the statute does not require an express misrepresentation. The statute focuses on the

false impression created rather than the falsity of any particular statement." 34 Wash. App. at 610, 663 P.2d at 499. In *Wellington* the Washington court held that a defendant could be convicted of theft by deception on the basis of conduct which creates a false impression in the mind of a third person. See, also, *Ray v. State*, 165 Ga. App. 89, 93, 299 S.E.2d 584, 587 (1983) (" 'creating a false impression does not necessarily require a false statement' ").

Section 28-512 is substantially similar to § 223.3 of the Model Penal Code, for which the "comment" includes:

> The traditional definition of a false pretense was the making of a false representation of fact. Language covering one who "creates or reinforces a false impression" has been substituted for the common-law concept. . . . Schemes designed to create a false impression in the mind of the actor should thus be included even though there has been no false representation in the sense of affirmative statements that are in fact untrue.
>
> . . . .
>
> . . . [I]t is the falsity of the *impression* [intentionally] created or reinforced that is determinative, rather than the

falsity of any particular representations made by the actor. Model Penal Code § 223.3 comment at 184-85 (1980). Under § 28-512(1) a person deceives another if he or she intentionally "[c]reates or reinforces a false impression" in such other person. Section 28-512 does not require that a defendant's deception take the form of an express or affirmative misrepresentation.

Similarly, § 28-512 does not state that a defendant's deception must relate to a material fact, but requires only that a defendant obtain property of another by "deception." In construing a previous Nebraska statute defining the crime of obtaining money by false pretenses, this court stated that the false pretense need only be "an effective cause in inducing the owner to part with his property." *State v. Bohannon*, 187 Neb. 594, 598, 193 N.W.2d 153, 155 (1971). We find nothing in the language of § 28-512 which necessitates a view more restrictive than that found in *Bohannon* regarding the effect of deception on a third person. As the comment to the Model Penal Code

provision states: "There is no requirement that the deception be material . . . . It suffices for conviction that the deception was effective, whether alone or with other influences, in securing the property for the actor." Model Penal Code, *supra* at 181.

Consequently, we hold that, under § 28-512(1), another's property is obtained by deception if an actor, by a statement or conduct, creates or reinforces a false impression in that person with the result that such false impression, alone or with other influences, effectively induces another to part with his or her property.

Implicit in Fleming's argument is the premise that no ordinary persons would have conducted themselves as did Leiferts and Buses regarding coverage with Arcadia. Although § 28-512 does mention statements "unlikely to deceive ordinary persons in the group addressed," neither Leiferts nor Buses were members of a group addressed by Fleming. Section 28-512(1) involves a subjective standard regarding impressions created by a defendant in the minds of individuals. See *Linne v. State*, 674 P.2d 1345, 1353 (Alaska App. 1983) (the statutory definition of deception under a virtually identical Alaska theft by deception statute "indicates an intent by the legislature to require a subjective standard"). We conclude that, except in circumstances involving some form of communication to a group, § 28-512 provides a subjective standard regarding the effect of a defendant's falsity, namely, whether such falsity actually deceived the person or persons from whom the defendant has obtained property.

Regarding Fleming's claim that the evidence is insufficient to sustain a conviction for theft by deception:

> In determining whether evidence is sufficient to sustain a conviction in a jury trial, this court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury—all of which is within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. [Citations omitted.]

*State v. Schott*, 222 Neb. 456, 462, 384 N.W.2d 620, 624-25

(1986).

The evidence in the present case, viewed most favorably to the State, shows that Fleming approached both Leiferts and Buses purporting to sell Arcadia medicare supplemental insurance. By his statements and conduct, Fleming created the impression that, by Arcadia's authorization, premiums paid to Fleming personally were payments to the company, that the couples had insurance coverage from Arcadia, and that delivery of issued policies had been delayed on account of Arcadia's addition of an Omaha office or merger with another insurance company. In reality, Fleming deposited the couples' checks in his personal bank account and never sent the couples' applications or premium payments to Arcadia. From all such circumstances, before and after receipt of the insurance applications and payment of premiums, a jury might reasonably infer that the absence of insurance policies was not due to an unkept promise by Fleming but that Fleming actually never intended to obtain any policy from Arcadia regarding either Leiferts or Buses. See *Com. v. Posavek*, 278 Pa. Super. 265, 420 A.2d 532 (1980) (defendant's intentional inaccessibility upon a customer's inquiry about a home improvement agreement and construction was a circumstance to be considered by a jury regarding requisite intent to deceive for conviction of theft by deception).

Fleming next maintains that the district court erred in allowing the State to cross-examine one of Fleming's witnesses regarding her prior conviction for issuing a bad check. Specifically, Fleming contends that the crime of issuing a bad check is not a crime involving "dishonesty or false statement" within the purview of Neb. Evid. R. 609(1) (Neb. Rev. Stat. § 27-609(1) (Reissue 1985)), which provides:

(1) For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination, but only if the crime (a) was punishable by death or imprisonment in excess of one year under the law under which he was convicted or (b) involved dishonesty or false statement regardless of the punishment.

Subsection (b) of Rule 609(1) allows credibility of a witness to be impeached only by a conviction of a crime involving dishonesty or false statement.

In reference to Fed. R. Evid. 609, the federal counterpart of Neb. Evid. R. 609, the conference committee report contains:

> By the phrase "dishonesty and false statement" the Conference means crimes such as perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully.

H.R. Conf. Rep. No. 1597, 93d Cong., 2d Sess. 9, *reprinted in* 1974 U.S. Code Cong. & Ad. News 7098, 7103. In *United States v. Smith*, 551 F.2d 348 (D.C. Cir. 1976), the U.S. Court of Appeals for the District of Columbia stated that the term "crimen falsi" encompasses "only those crimes characterized by an element of deceit or deliberate interference with a court's ascertainment of truth." *Id*. at 363. As noted in *United States v. Hayes*, 553 F.2d 824, 827 (2d Cir. 1977): "The use of the second prong of Rule 609 . . . is thus restricted to convictions that bear *directly* on the likelihood that the defendant will *testify* truthfully (and not merely on whether he has a propensity to commit crimes)." A crime involves "dishonesty or false statement" when intent to deceive or defraud is an element of the crime. See *United States v. Millings*, 535 F.2d 121 (D.C. Cir. 1976).

In his treatise on the Federal Rules of Evidence, Weinstein observes that "the state definition of the crime" governs whether the crime can be classified as one involving "dishonesty or false statement." 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 609[04] at 609-71 (1985). Section 28-611(1) provides in part as follows:

> Whoever obtains property, services, or present value of any kind by issuing or passing a check or similar signed order for the payment of money, knowing that he or she has no account with the drawee at the time the check or order is issued, or, if he or she has such an account, knowing that he or she does not have sufficient funds in,

or credit with, the drawee for the payment of such check or order in full upon its presentation, commits the offense of issuing a bad check.

To be guilty of issuing a bad check in violation of § 28-611(1), a party issuing the check must know that he or she does not have sufficient funds to cover the check. In *State v. Kock*, 207 Neb. 731, 736, 300 N.W.2d 824, 826 (1981), we held "that the language of § 28-611(1) [also] requires a finding of intent to defraud by obtaining property, services, or present value of any kind." Thus, every conviction under § 28-611 requires either an admission or finding that a defendant knowingly issued a bad check with an intent to defraud.

In *United States v. Mucci*, 630 F.2d 737 (10th Cir. 1980), the defendant contended the lower court erred in allowing the government to introduce, during cross-examination of defendant, defendant's prior conviction under an Ohio statute making it a misdemeanor for " '[a] person, with purpose to defraud, [to] issue . . . or cause to be issued or transferred a check or negotiable instrument, knowing that it would be dishonored.' " *Id.* at 743. Referring to the conference committee report regarding Fed. R. Evid. 609, the court rejected defendant's contention that the report disclosed "an intent that conviction on a bad check charge not come within the 'dishonesty or false statement' clause." 630 F.2d at 743. Finding that the report evidenced "the opposite intent" from that suggested by the defendant, the court concluded that defendant's misdemeanor conviction under the Ohio statute was admissible under Fed. R. Evid. 609 as a crime involving "dishonesty or false statement." *Id.* at 744. We agree with the conclusion reached by the court in *United States v. Mucci, supra*.

In *State v. Ellis*, 208 Neb. 379, 303 N.W.2d 741 (1981), we considered whether the former crime of "petit larceny" (Neb. Rev. Stat. § 28-512 (Reissue 1975)) was one involving "dishonesty or false statement" within the purview of § 27-609 and concluded that petit larceny did not, in every case, involve "deceit or deception so as to be classified as 'crimen falsi.' " *Id.* at 397, 303 N.W.2d at 752. In *Ellis* we held that, because the proponent of the evidence had not shown that the particular

petit larceny in question involved something more than "ordinary stealing," the district court correctly excluded evidence of the prior conviction for petit larceny. However, in contrast to the offense of petit larceny as previously construed by this court, § 28-611 requires, as an element of the crime of issuing a bad check, that a defendant possess an intent to defraud. Clearly, as defined in § 28-611, the offense of issuing a bad check involves "some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully." H.R. Conf. Rep., *supra.* No showing of circumstances underlying the offense of issuing a bad check is necessary to establish the requisite element of deceit. We hold that a conviction of the offense of issuing a bad check in violation of § 28-611 is, as a matter of law, a crime involving "dishonesty or false statement" for the purpose of Neb. Evid. R. 609(1)(b). The district court did not err in allowing the State to raise the fact of the witness' previous misdemeanor conviction for a bad check in violation of § 28-611.

Finally, Fleming contends the court erred in refusing his request for a continuance so that he might obtain the deposition of the out-of-state witness, Swessinger. "[A] motion for continuance is addressed to the sound discretion of the court, and in the absence of a showing of an abuse of discretion, a ruling on a motion for a continuance will not be disturbed on appeal." *State v. Pierce and Wells,* 215 Neb. 512, 519, 340 N.W.2d 122, 127 (1983).

A factor bearing upon a court's discretionary decision to grant or deny a continuance sought for the purpose of obtaining additional evidence is whether the party seeking the continuance has exercised diligence in attempting to procure the evidence. See, *Heffernan v. Kissack,* 192 Neb. 637, 223 N.W.2d 486 (1974); *Vore v. State,* 158 Neb. 222, 63 N.W.2d 141 (1954); *Smith v. State,* 109 Neb. 579, 191 N.W. 687 (1922). See, also, *Bowie v. State,* 85 Wis. 2d 549, 556-57, 271 N.W.2d 110, 113 (1978) (trial court, in passing upon a motion for a continuance, should consider "whether the moving party has been guilty of any neglect in endeavoring to procure the attendance of the witness"). In the present case, Fleming filed his motion 1 day before trial. Although Fleming was aware some 2 months prior

to trial that Swessinger planned on leaving the state, Fleming did not take Swessinger's deposition or seek measures to compel Swessinger's attendance at trial. Fleming's counsel conceded that Swessinger's doctor had not forbidden Swessinger from traveling, and there was evidence to support a finding that Swessinger simply did not wish to attend Fleming's trial.

Swessinger's testimony would have merely corroborated the testimony of Fleming and Fleming's three witnesses who testified at trial, and was obviously cumulative. Although credibility of two witnesses for Fleming was subject to impeachment pursuant to Neb. Evid. R. 609, there was no showing that Swessinger's credibility was immune from similar attack and impeachment. Fleming's counsel stated only that he had *no knowledge* that Swessinger had a prior *felony* conviction. "There is no abuse of discretion by the court in denying a continuance unless it clearly appears that defendant suffered prejudice as a result thereof." *State v. Pierce and Wells, supra* at 519, 340 N.W.2d at 127. Under the circumstances of this case, the district court did not abuse its discretion in denying Fleming's request for a continuance.

Regarding Fleming's question about constitutionality of § 28-510 (consolidation of theft offenses), we reiterate our oft-stated principle as expressed in *R.D.N. v. T.N.*, 218 Neb. 830, 835-36, 359 N.W.2d 777, 781 (1984): "Generally, constitutional issues not properly before the court below will not be considered by this court for the first time on appeal." See, also, *State v. Mercer*, 217 Neb. 164, 347 N.W.2d 868 (1984).

Fleming failed to raise the issue of constitutionality of § 28-510 in the proceedings before or during trial on the information, and, therefore, we will not consider such issue of constitutionality raised for the first time on appeal to this court.

The judgment of the district court is correct in all respects and is, therefore, affirmed.

AFFIRMED.