**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Dorothy L. IRON NECKLACE and Clayton Iron Necklace, Defendants and Appellants.**

**Nos. 15759, 15787.**

Supreme Court of South Dakota.

Argued Jan. 12, 1988.

Decided Sept. 21, 1988.

Frank Geaghan, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Roger A. Tellinghuisen, Atty. Gen., Pierre, on brief.

Diane Billings Beck, Aberdeen, for defendant and appellant Dorothy L. Iron Necklace.

Matthew R. Metzgar of Gillette, McClure & Metzgar, Redfield, for defendant and appellant Clayton Iron Necklace.

MORGAN, Justice.

Dorothy Iron Necklace and Clayton Iron Necklace (Dorothy, Clayton, and collectively Iron Necklaces or appellants), appeal from jury verdicts convicting them of grand theft and burglary. We affirm.

Appellants raise some sixteen issues which will be defined in the course of the opinion.

On the morning of September 11, 1986, the Spink County Sheriff's Office received a report of a jewelry theft at the Stacey Drug Store in Redfield, South Dakota. As a result of the investigation and some information available, which will be discussed in detail in issue one, hereafter, Deputy Sheriff Albright (Albright), of the Spink County Sheriff's Office, put out a bulletin requesting that an orange Caprice with Washington license plates be stopped and the occupants be held for questioning with regard to the theft.

At approximately 7:00 p.m. that evening, two Faulk County sheriff's deputies observed the orange Mercury Caprice parked on the roadside west of Faulkton. Appellants, their children and the automobile were transported to the Faulk County Sheriff's Office in Faulkton. Albright was notified and immediately drove to Faulkton. Upon Albright's arrival, he requested permission of appellants that he be permitted to search their car. Permission was first given, but later withdrawn before a search could be started. Albright then gave Clayton his *Miranda* warning and began questioning him when he waived counsel. Shortly after questioning began, Clayton then asked for an attorney and the questioning ceased. Albright then sought to question Dorothy, but she asked for counsel immediately after receiving her *Miranda* warning, so no further questioning was done.

Albright then returned to Redfield and consulted with the state's attorney regarding obtaining a search warrant to search the car. The state's attorney decided that Albright should first check the Aberdeen pawn shops to see if any of the jewelry had been pawned. In the meantime, appellants were transported to Aberdeen where they were held and the children were put into foster care.

While appellants were being detained in the Faulk County Sheriff's Office, Clayton was observed tearing up some paper into small pieces. After appellants were moved to Aberdeen the sheriff retrieved the small pieces from the wastebasket, pieced them together and then advised Albright that he had recovered insured mail receipts showing Kent, Washington as the destination.

The next morning, Albright and DCI Agent Jerry Lindberg (Lindberg) visited various pawn shops in Aberdeen as Albright had been directed by the state's attorney. Albright also had a business card from one of the shops that had been recovered from Dorothy's purse pursuant to an inventory search during booking procedures into the Aberdeen jail. The inquiry resulted in recovery of a number of Black Hills gold rings allegedly pawned by appellants, together with the tickets signed by Dorothy.

Albright and Lindberg next visited the Aberdeen post office, from whence the insured mail receipts originated. The result of the investigation into the mail receipts was the retrieval by the prosecution of three packages from an address in Kent, Washington, each containing Black Hills Gold rings.

Appellants sought suppression of all of the evidence heretofore mentioned by pretrial motion and the first issue raised by appellants is the trial court's failure to suppress the evidence urged to be "tainted fruit of the poisonous tree" resulting from an illegal arrest. The crux of this issue is whether the stop and detention was a violation of appellants' Fourth Amendment rights due to lack of probable cause.

This court has on numerous occasions defined "probable cause." In *State v. Oyen*, 286 N.W.2d 317, 318–19 (S.D.1979), we said:

> Probable cause for arrest exists where facts and circumstances within a police officer's knowledge of which he had reasonably trustworthy information 'are sufficient in themselves to warrant a belief by a man of reasonable caution that a crime has been.... committed.' (Citation omitted.)

*See also Terry v. State of Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In *State v. Moves Camp*, 286 N.W.2d 333, 336 (S.D.1979), we said:

> [P]roof beyond a reasonable doubt is not required. While good faith on the part of the arresting officers is not enough, officers need only be reasonable and prudent, and they need not operate as legal technicians. (Citation omitted.)

*See also Brinegar, supra.*

In determining whether the trial court erred in denying appellants' motion to suppress evidence, this court must consider the evidence in the light most favorable to support the trial court's decision. *Moves Camp, supra; State v. DuBois*, 286 N.W.2d 801 (S.D.1979); *State v. Kiehn*, 86 S.D. 549, 199 N.W.2d 594 (1972). Once the trial court has entered a finding, that finding is binding on this court unless such finding is clearly erroneous. *DuBois, supra; State v. Lyons*, 269 N.W.2d 124 (S.D. 1978).

The Iron Necklaces and their children were detained by two Faulk County Deputy Sheriffs as previously noted. The deputies acted in response to a teletype bulletin to law enforcement agencies issued by Deputy Sheriff Albright (Albright) of the Spink County Sheriff's Office. That bulletin read substantially as follows:

> IMMEDIATE GENERAL INFO TO ALL UNITS AND STATIONS
> GRAND THEFT FROM STACEY DRUG STORE IN REDFIELD BETWEEN 10:00 AND NOON THIS DATE
> TAKEN WAS $1,700.00 WORTH OF BLACK HILLS GOLD JEWELRY.
> MOSTLY LANDSTROMS AND SOME STAMPERS BRAND
> ....
> POSSIBLE SUSPECTS ARE:
> (1) INDIAN MALE 25–30 YOA BROKEN NOSE AND RECENT INJURIES

TO FOREHEAD BANDANA AROUND HEAD
(2) WHITE FEMALE 25–27 YOA SLIM BUILD WITH LONG STRAIGHT BROWNISH BLONDE HAIR—STRAIGHT HAIR
1—MALE CHILD BETWEEN 4–6 YOA
1 FEMALE CHILD 4–6 YOA
POSSIBLE DRIVING AND (sic) OR-GANE (sic) CAPRI WITH LICENSE # IHX075 WASHINGTON PASS
PLEASE PUT THIS OUT IMMEDIATE-LY. THEY CAN'T BE FARAAWAY (sic). IF WASHINGTON VEHICLE LO-CATED, CHECK FOR RINGS. THEY SHOULD BE IN BULK, THEY LEFT THE BOXES BEHIND.

The bulletin was apparently sent out at 2:46 p.m. on September 11, 1986.

The genesis of this message was the report to the Spink County Sheriff's Office of the theft of jewelry from Stacey's Drug Store in Redfield. Investigation by a Red-field police officer gave authorities the descriptions of four individuals, described above, and a couple more "locals" who had been in the store during the period when the theft was believed to have occurred. Albright remembered seeing a teletype received that very morning from the Gettys-burg Police Department warning authorities to be on the "lookout" for an orange Mercury Caprice driven by Dorothy Iron Necklace, other occupants: two children and an Indian male, age 25 to 30, with bruise on his nose, identified as Robert S. Smith (Smith). Albright obviously noted the striking similarity between the general descriptions given by the Stacey Drug per-sonnel and the Gettysburg teletype: two adults, one white female and one Indian male with a sore nose; two children, one male and one female. Albright checked the national crime computer for informa-tion on Dorothy Iron Necklace and Smith. He also talked to a Mobridge police officer who advised him that Dorothy and Clayton Iron Necklace had been staying in Mo-bridge for the last two weeks and that they were accompanied by another individual who was then being held in jail on a shop-lifting charge. The Mobridge police officer

also advised Albright that Clayton Iron Necklace had pawned jewelry in the Mo-bridge area. Albright then checked the name of Clayton Iron Necklace in the na-tional crime computer and found that he had an extensive arrest record in Washing-ton State, but nothing at that time in South Dakota. Based on the information that he had collected, as noted above, Albright then put out the bulletin which resulted in appellants' detention.

The trial court entered findings of fact and conclusions of law supporting denial of the suppression motion. The pertinent findings in the Clayton Iron Necklace case include:

### VIII.

That insured mail receipts were found by Sheriff Wheery on September 11, 1986 in the Faulk County Sheriff Office's waste-basket. These slips were discovered by Sheriff Wheery after he observed Doro-thy Iron Necklace and Clayton Iron Necklace looking for something in Doro-thy Iron Necklace's purse and Clayton Iron Necklace's pockets. After the Iron Necklaces left the Sheriff's office, Sher-iff Wheery looked around the area where the Iron Necklaces had been sitting and in the waste basket. Sheriff Wheery pieced together several torn up slips of paper that when pieced together were three insured mail receipts from the Ab-erdeen, South Dakota Post Office. The court specifically finds that these re-ceipts were not taken from the person of either Dorothy Iron Necklace or Clayton Iron Necklace or from their belongings.

. . . .

### XI.

That on September 11, 1986, Deputy Al-bright did read and explain to Defendant his Miranda rights. The Court specifical-ly finds that this occurred at the Faulk County Sheriff's Office and prior to Sheriff Wheery finding the insured mail receipts.

## XII.

The Court finds that on September 11, 1986, the Spink County Sheriff received a tele-type message from the Gettysburg police to be on the alert for a white woman named Dorothy Iron Necklace traveling with an Indian male, and two white children. The Court specifically finds that this tele-type was received by the Spink County Sheriff prior to the arrest and detention of the Defendant.

Identical findings were entered with respect to Dorothy Iron Necklace's case. Based upon the foregoing findings, the trial court entered conclusions of law in the respective cases as follows:

## IV.

The Court concludes that obtaining the insured mail receipts by Sheriff Wheery was not a search and as a result all evidence resulting from the insured mail receipts is admissible.

## V.

The Court concludes that there was probable cause to detain the Defendant on September 11, 1986 and such detention and arrest was not illegal.

■ We first examine the trial court's determination that there was probable cause for the detention of appellants. In this regard, we first note that appellants make no issue of the fact that the initial detention by the Faulk County deputies was done pursuant to the directive of the bulletin. The crux of appellants' argument, as stated in their briefs, appears to be that the detention occurred prior to probable cause being established. Appellants were then held while physical evidence was gathered, all of which was found as a result of the unlawful detention. With this contention, we do not agree.

It is noteworthy that appellants' activities encompassed quite an area in north central South Dakota: Following U.S. Highway 12 about 100 miles from Mobridge to Aberdeen, thence south on U.S. Highway 281 to Redfield, a distance of 42 miles, and thence westward on U.S. Highway 212 as far as Gettysburg, some 81 miles; encompassing over 4,000 square miles and lying within the boundaries of six contiguous counties. It is obvious that in policing such an extensive area the authorities rely on radio, teletype and telephonic communications. It is also obvious that the authorities make some attempt to keep each other alert to "possibilities," as evidenced by the "information bulletin" sent out by the Gettysburg Police Department. The record does not reflect the reason the vehicle was stopped and the occupants questioned in Gettysburg, but that is immaterial because the only result was an information bulletin which did not come into play until after the fact of the theft.

The United States Supreme Court, in *Terry* said:

[The exclusionary rule] cannot properly be invoked to exclude the products of legitimate police investigative techniques on the ground that much conduct which is closely similar involves unwarranted intrusions upon constitutional protections.

392 U.S. at 13, 88 S.Ct. at 1875, 20 L.Ed.2d at 901. Further, in discussing the factor of reasonableness in the probable cause test, the *Terry* court said:

In order to assess the reasonableness of [the officer's] conduct as a general proposition, it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' (citation omitted) And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.

392 U.S. at 20–21, 88 S.Ct. at 1879–80, 20 L.Ed.2d at 905–06.

Again discussing the probable cause test in *Brinegar, supra,* the Court said:

These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection.... The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

338 U.S. at 176, 69 S.Ct. at 1311, 93 L.Ed. at 1890–91.

In this case, it appears appellants ran afoul of good police techniques. Albright started with the description of a party of four, which descriptions were somewhat distinctive. He coupled that description with that found in the information bulletin. He then had the physical descriptions and a car identified. Albright then checked the names he had acquired from the bulletin and additional inquiries and came up with the information that Clayton had a long criminal record in the state of Washington, where the car was licensed. The issue then is, did Albright have probable cause to put out the teletype directing apprehension and detention of appellants at that point in time? We hold that he did. As the *Brinegar* court said: "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." 338 U.S. at 175, 69 S.Ct. at 1310, 93 L.Ed. at 1890.

In view of our decision that appellants were detained with probable cause, we need not examine the issue of whether or not the acquisition of the mail receipts from the sheriff's wastebasket amounted to a search. The search of Dorothy's purse, which garnered the pawn shop business card, is likewise upheld as a valid search.

Prior to trial, appellants also moved to suppress in-court identification by four of State's witnesses: two Stacey Drug Store employees, Connie Newman and Debbie Dosch; the pawn shop operator, Rory Foresman; and the postal employee, Derrick Herther. The ground for suppression was alleged to be one-photo lineups using impermissibly suggestive booking photographs in the investigatory stage and at the grand jury proceedings. Appellants now claim the trial court erred in failing to grant their suppression motions. After the suppression hearing, the trial court entered findings of fact and conclusions of law supporting an order denying the motions.

The purpose of suppressing in-court identifications, which stem from a photographic identification procedure that is impermissibly suggestive, is to prevent a substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *State v. Esslinger*, 357 N.W.2d 525 (S.D.1984); *State v. Sahlie*, 90 S.D. 682, 245 N.W.2d 476 (1976); *State v. Barcley*, 88 S.D. 584, 225 N.W.2d 875 (1975). The burden of establishing impermissible suggestiveness is on the party seeking to suppress the evidence. *Esslinger, supra; Sahlie, supra; Barcley, supra.* The suggestiveness of an identification procedure must be determined from the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Phinney*, 348 N.W.2d 466 (S.D.1984); *State v. Dace*, 333 N.W.2d 812 (S.D.1983).

 In appellants' briefs, they fail to cite us to any pages in the record where identifications were made of which they now complain. Nor do they make any reference to the pretrial hearing on their suppression motions and the resultant findings and conclusions entered by the trial court. Their argument is couched in generalities, most of which are not particularly pertinent to this case. Granted, one-photo lineups can be dangerously suggestive and may lead to irreparable misidentification. *Simmons, supra.* Though we have cautioned against them on more than one occasion, *State v. O'Connor*, 87 S.D. 77, 203

N.W.2d 183 (1973); *State v. Iron Shell*, 86 S.D. 100, 191 N.W.2d 803 (1971), they are not unconstitutional if they meet certain factors for determination of reliability. *Biggers, supra; Phinney, supra.* The several factors set forth in *Biggers* and *Phinney* are: (1) The opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. 409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411; *Phinney*, 348 N.W.2d at 468–69. These factors are to be weighed against the corrupting effect of the suggestive identification itself. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Phinney, supra.*

■ The trial court's findings, summarized for the sake of brevity, are as follows:

With respect to Foresman, the pawn shop proprietor, the officers (Deputy Albright and DCI agent Lindberg) first obtained a detailed description of the suspects, an account of his opportunity to observe them (in this instance he had done business with them on a prior occasion) and then showed him the booking photos for confirmation of the identification.[1]

With respect to the Stacey Drug employees, Newman and Dosch, they had both given detailed descriptions of the suspects in the original investigation. They had ample opportunity to observe them in the course of two or more conversations in the store on the morning in question, and were not shown the photos until their appearances at the Grand Jury proceedings when they were unequivocal, absolute, affirmative and positive in their identifications.

The trial court specifically found that all witnesses first described the appellants, described them accurately, noted the children accompanying the adults,

and that the use of the photos did not affect the identification process.

In addition to being unchallenged by appellants, these findings are supported by the record of the suppression hearing. We affirm the trial court's decision on the motion to suppress.

Dorothy's brief also makes some vague reference to a display of Dorothy herself to the witnesses before trial. Again, the brief makes no reference to the record where such a showing was made or where any objection was made to preserve the record. We can find nothing. It certainly was not included in the motion for suppression and we therefore deem that issue waived.

The third issue raised by appellants is more troubling. Was the state's attorney engaged in prosecutorial misconduct and to such an extent as to deprive appellants, or either of them, of due process and a fair trial? The allegations of prosecutorial misconduct fall into three categories: (1) failure to comply with the prior discovery order of the trial court by furnishing to the defense the names of eight previously undisclosed prospective witnesses only two working days before trial was set to commence; (2) instructing one of those prospective witnesses not to talk to defense counsel; and (3) arguing to the jury in final argument based on evidence not presented to the jury. The first two are intertwined.

■ First, it is urged that although the state's attorney received a request for the names of witnesses on December 8, 1986, she did not respond with a list until 4:00 p.m., January 23, 1987. Trial was set to begin on January 28. Appellants' complaint stresses that the list contained the names of eight witnesses not previously endorsed on the informations and who had not previously testified at the preliminary hearing. Although the state's attorney had prepared and served a subpoena on Christina Jessen (Jessen), one of the new witnesses, on December 19, 1986, she stated, at a January 26 discovery hearing, that she had no written statement from Jessen

1. With respect to Herther, the same procedure was followed, however the issue is moot as to

him because he did not, in fact, appear at the trial to testify.

in her file, was not aware of any such statement in any police file, nor had she personally interviewed her at that point. Defense counsel characterized that as a refusal to furnish information. The state's attorney further pointed out that Jessen's name had been mentioned in the preliminary hearing as one of the Stacey Drug employees on duty that day, and thus defense counsel could have interviewed her if they desired.

Nowhere in their briefs do defense counsel point to any place in the record where they objected to the endorsement of the additional witnesses. At the start of the second day of trial, however, defense counsel moved in the alternative for a mistrial or to strike Jessen's testimony, although she had not yet testified, upon all of the grounds previously urged as failure to comply with the discovery motion and for the additional reason that when they did try to interview Jessen, she first sought advice from the state's attorney by telephone, and then refused to talk to them upon the purported instructions of the state's attorney. After considerable hemming and hawing, the state's attorney did admit that, when reached by telephone by Jessen whom she described as very nervous, her advice was: "I told her that it was her choice and I also told her I would prefer she not talk, but again I stated, 'It's your choice, Christina.'" The trial court recognized that the expression of the preference was a complete change in the policy previously expressed by the state's attorney. While the trial court overruled the motion for mistrial and the motion to exclude Jessen's testimony, it directed that defense counsel be given another opportunity to interview Jessen. If Jessen again refused, the trial court stated it would have to reconsider the motion to exclude her testimony. The trial court then, however, denied the defense motion to continue the voir dire until after the interview and required defense to proceed with jury selection. Apparently defense counsel was able to interview Jessen, because now they also complain on appeal that the trial court required them to proceed with voir dire before they had an opportunity to conduct the interview.

Appellants' argument is founded on the *Brady v. Maryland* decision of the United States Supreme Court, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963), wherein that court said:

We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

More recently, in *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413, 419 (1984), the court stated further:

Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right the Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.' (Citation omitted.)

The *Brady* doctrine has long been recognized and applied by this court.

■ It is a little difficult to imagine a prosecutor approaching within two or three days of a trial date without having interviewed or received a written report on the expected testimony of any key witness. In this instance, the record reflects that the state's attorney involved in the trial had come into office at some point subsequent to the commission of the offense charged. The fact the prosecutor was inexperienced in office, or even a neophyte, does not, of course, diminish the appellants' constitutional right to a fair trial. It merely indicates that some of the problems were occasioned by inexperience, rather than purposeful misconduct. However, we would be remiss if we did not take this opportunity to remind all prosecuting attorneys, as we have in the past, it is the foundation of the criminal justice system to see that the

defendant and every defendant gets his day in court and a fair trial. This burden weighs as heavily on prosecutors as it does on the judge, jury and defense counsel. *State v. Kidd,* 286 N.W.2d 120 (S.D.1979).

The explanation might lie in the determination whether Jessen was, indeed, a key witness. Whatever prejudice appellants would suffer by the trial court's refusal to delay voir dire until after the defense counsel could interview Jessen is not clearly explained. Dorothy's counsel termed Jessen's testimony as "the most dynamic as she was the only person who put Dorothy anywhere near the jewelry case." Counsel then speculates that had "her testimony been produced early enough prior to trial, it would have been possible for Dorothy to more properly compare her statement with those of the other workers in Stacey Drug that day to show inconsistencies and the impossibility of her facts as presented." We consider this to be pure speculation inasmuch as here, after trial, with the trial transcripts before her, Dorothy's counsel could not or did not point out any inconsistencies or impossibilities of Jessen's facts. To characterize Jessen's testimony placing Dorothy near the jewelry case as dynamic, in light of the hard evidence that she had pawned some of the jewelry and mailed some to her mother in Washington state, is pure puffery.

The issue was raised again briefly in a motion for new trial and again denied. As we also said in *Kidd, supra,* "we will not disturb the trial court's ruling on a motion for a new trial based on misconduct of counsel unless we are convinced there has been a clear abuse of discretion." 286 N.W.2d at 122. The trial court, having heard the testimony of Jessen, we cannot decide from a cold record that it has clearly abused its discretion.

Lastly, appellants argue that state's attorney made impermissible comments during closing argument, to the effect that appellants went to the Aberdeen post office and mailed the packages to Washington. The pertinent part of the closing argument is set out below.

STATE'S ATTORNEY: As Mr. Foresman testified, he thinks perhaps Clayton signed one of them and what do they do next? Maybe before this pawn shop or maybe after, they went to the Aberdeen post office and they sent some packages to Washington.

MR. GERDES: Your Honor, I'll object. There's no evidence along those lines at all. I'll ask that the prosecutor be limited to the evidence that's been presented.

■ We deem this issue not preserved for appeal. Appellants did not request the trial court to admonish the jury to disregard the remark, nor did they move for a mistrial. Therefore, the trial court did not have an opportunity to make a decision from which there could be an abuse of discretion. *State v. Dace,* 333 N.W.2d 812 (S.D.1983).

■ Even had appellants fairly raised the issue for appeal, we would have affirmed. "Counsel is allowed considerable latitude in argument and has the right to comment on matters supported by the evidence." *State v. Shult,* 380 N.W.2d 352, 355 (S.D.1986); *State v. Standing Soldier,* 299 N.W.2d 568 (S.D.1980). Judging from the briefs, although the objection noted above is less than clear, it went to the failure to have the postal employee appear and testify and identify appellants. The state's attorney's response on the record appears dispositive of this argument:

PROSECUTOR: How do we know they went to the post office? Because we have these packages postmarked Aberdeen, South Dakota, September 11, 1986. Who are they from? The Iron Necklace family. Who are they addressed to? Bonnie Wells in Kent, Washington.

The arguments complained of were clearly within the ambit of fair comment.

■ The next issue we will consider is the claim that appellants were denied a fair trial because of comments made by a potential juror during voir dire. The incident arose during voir dire examination by Dorothy's counsel. When questioning the panel generally as to prior knowledge of the

case received by word of mouth or from the newspapers, a Mr. Thelen (Thelen), who also happened to be the county coroner, indicated he was a county official and knew quite a bit about the case from the sheriff and one of the victims. Under further examination, he admitted he had come to some decision in the matter and that he was acquainted with the police officers in the area. No attempt was made to challenge Thelen for cause. Instead, counsel continued the general questioning and came to these queries:

... Now, for instance, lets take a vote. Right now, if you had to vote right now, before this trial even started, would you vote to acquit Mrs. Iron Necklace or to convict her? How many would vote to acquit her right now? Is there anybody that would vote to convict her right now before the trial starts? Juror [Thelen], you would?

Juror: I think as I said before I think I have too much information. I have a lot of information right now that I would have to go by.

Again, no attempt was made to strike Thelen for cause. Rather, a hearing was held outside the presence of the jury on appellants' motions for a mistrial or in the alternative for a new jury panel. The trial court denied the motions, stating there had been sufficient cause to excuse the juror after the first response. The trial court pointed out that the juror merely answered the questions put to him by counsel, had not volunteered any facts, but merely expressed his own opinion. The trial court also determined to deny Clayton's motion because his counsel had merely sat by and permitted the interrogation to go on. We find appellants' argument to be ludicrous. It is hard to imagine an interrogation more contrived to invite error. When any defense counsel is willing to put the guilt or innocence of a client to a vote of prospective jurors before trial, especially with the knowledge that one of those prospective jurors indicated possession of information regarding the facts, counsel is clearly inviting just such a result as we have here and counsel will have to live with it. We find this issue to be wholly without merit.

■ Appellants' next issue centers around the method of selection of additional jurors after the first panel was exhausted. After the first day of voir dire, the initial jury panel was exhausted by challenges and it was necessary for additional jurors to be summoned. Appellants argued that SDCL 16–13–42 was the appropriate statute to follow in summoning additional jurors under the circumstances. The trial court directed that the additional jurors be summoned under the provisions of SDCL 16–13–43. Under the latter statute the sheriff, a deputy sheriff, or the coroner, is ordered to summon a sufficient number of persons qualified as jurors; whereas, under the prior statute, the clerk of courts summons people from the master jury list. In support of their argument against use of the latter method, appellants also cited the trial court to SDCL 16–13–24 which provides that when the sheriff is a party to a suit pending in the court, he shall be deemed disqualified and a substitute appointed for the drawing of additional jurors. We find these arguments unpersuasive. The sheriff was not a party and the additional jurors were secured by a deputy who had no connection with the trial of this case. Appellants do not claim any actual prejudice, but rather, they claim a potential abuse in the jury selection. "In the absence of any showing that appellants were prejudiced by the sheriff's participation in the statutory selection process, their argument is without merit." *State v. Reiman,* 284 N.W.2d 860, 868 (S.D.1979). We affirm the trial court's use of SDCL 16–13–43.

■ As a spin-off from this issue and the statements made by Thelen, dealt with in the previous issue, Dorothy also claims the trial court erred in denying her motion for extra peremptory challenges. First, Dorothy cites us to no authority in support of her requests. Second, inasmuch as we have approved the trial court's decisions in both issues, we do not find her argument persuasive. It is in the trial court's discretion, for good cause shown, to grant additional challenges. SDCL 23A–20–21. The motion was made after twelve jurors were

seated and the trial court was ready to swear them in, long after the court's rulings on the issues. We do not find that the trial court abused its discretion under the circumstances.

The next issue raised by appellants is the trial court's failure to properly admonish an alternate juror after selection. After the twelve jurors were seated and sworn in, they were excused and directed to report the next morning. The trial court properly admonished them not to converse among themselves or with anyone else about any subject connected with this trial or to form or express an opinion. The voir dire was then continued to select an alternate juror. After the alternate was selected, the oath was given and the court was adjourned for the day. No admonition was given to the alternate juror.

■■■ Trial began the next day and continued on into the second day. One of the jurors was excused because of a family emergency and the alternate became a part of the panel. During a recess in the second day of trial, appellants moved for a mistrial on the ground that the alternate had not been properly admonished after her selection. The trial court denied the motion. We agree. As State suggests, defense counsel failed to make timely objection to call the oversight to the trial court's attention. Furthermore, as the trial court noted, the alternate was present at voir dire when the jurors were admonished and also was present during the trial when, at the various breaks, the jury was again admonished. The record reflects that the trial court did carefully follow the mandate of SDCL 23A-24-5 at every other adjournment. We find no indication that this minor omission affected the verdict. *State v. Lang*, 354 N.W.2d 723 (S.D.1984); *Kost v. State*, 344 N.W.2d 83 (S.D.1984).

■■■ South Dakota Constitution Article VI, § 7, provides that: "In all criminal prosecutions the accused shall have the right to defend in person and by counsel; ... to have compulsory process served for obtaining witnesses in his behalf...." These seemingly harmonious constitutional provisions are cast into conflict in appel-

lants' next issue. During the course of the trial, both counsel sought to withdraw from representation of their respective clients for the reason that they saw themselves as important witnesses for their clients based on alleged inconsistencies between the preliminary hearing testimony of a witness and her testimony at trial and a statement made to counsel a day or so earlier. The trial court denied the motion, stating that the inconsistency did not seem to be major and would not justify allowing counsel to withdraw. Whereupon Clayton advised the trial court that he wished to dismiss his counsel. The trial court cautioned Clayton that if he did dismiss his counsel new counsel would be coming in without any background of the case or if Clayton intended to proceed pro se he would be held to the same standards as an attorney. Clayton indicated he did not want to proceed pro se, but wanted the court to appoint new counsel for him. Dorothy likewise asked to dismiss her counsel. The trial court ruled that the reasons given would not be sufficient to authorize the court to appoint substitute counsel. After a brief conference with counsel, Clayton stated: "[T]he two choices given to me at this time each deny me my constitutional rights, but of the two I choose to have my present attorney continue to represent me." Dorothy agreed in that statement.

The constitutional conflict arises in this case due to the provisions of SDCL 19-1-3, which provide in pertinent part: "When an attorney is a witness for his client upon any trial except as to merely formal matters such as the attestation or custody of an instrument or the like, he shall not further participate in such trial." In this situation, the trial court is required to balance the two constitutional rights. We perceive that the trial court did so, effectively and correctly. This is an issue which has only come up of recent date and we have not heretofore written on it in extenso.

As appellants argue, we have said in *State v. Wiegers*, 373 N.W.2d 1, 10 (S.D. 1985): "In addition to the conferring upon a defendant the right to call witnesses on his behalf, South Dakota Constitution Arti-

cle VI, § 7, also guarantees a defendant the right to impeach the state's key witnesses by showing bias on their part." We also said: "[The State's witness'] testimony was essential to satisfy the State's burden of proof on Count I and was powerful evidence with respect to Count III. He was clearly a crucial witness on those counts. Accordingly, defendant should have been given great latitude in seeking to impeach his testimony." *Id.* In *Wiegers,* the issue was alleged intimidation by the State through threats of prosecution for perjury, a far cry from the issue before us.

■■■■ The issue with respect to the appointment of counsel is better characterized as the appointment of substitute counsel. Appellants were being represented by diligent and artful counsel. We do not fault them for the untimeliness of the motions. Much of the delay can be directly attributed to the failure of the state's attorney to make timely response to the request for a witness list. We do recognize that other courts have written on the right of the defendant to require appointment of substitute counsel under the right to counsel provisions of the federal and state constitutions. We are impressed by and we adopt the Michigan authorities which hold:

> Appointment of substitute counsel is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process. (citation omitted) A trial court's decision on a request for substitution or a continuance will not be reversed on appeal absent a showing of an abuse of discretion.

*People v. Johnson,* 144 Mich.App. 125, 133–135, 373 N.W.2d 263, 268 (1985).

We then examine the decision of the trial court in the light of the authorities that we have recognized. The court recognized the problem of introducing new counsel into the trial. That is a given fact, regardless of fault. Most importantly, the trial court said:

> The inconsistency in this case does not seem to be, in view of the witnesses current testimony, a major inconsistency.

It does not appear it would justify allowing counsel to withdraw based upon what's presently before the court.

Defense counsel were seeking to testify as to statements made to them by Sharon Stacey regarding who it was who came back to her in the pharmacy and relayed an inquiry, allegedly from one of the appellants, about the availability of "one-day" photo processing. At the preliminary hearing, she had apparently testified that it was Deb Dosch, in counsels' interview she apparently named Christina Jessen, but at trial she had testified that they both did at different times. The defense argument was that State's witness' testimony was critical to identification of appellants and to placing Clayton in the proximity of the jewelry. They suggest the inconsistencies show that either the witness does not remember or that the witnesses have all gotten together and made sure their stories were straight. We agree with the trial court's reasoning. The nature of the proposed impeachment was so minimal, balanced against the disruption of the trial that would be occasioned by the appointment of substitute counsel, we cannot say that the trial court abused its discretion. The wide latitude for impeachment testimony referred to in *Wiegers* is not limitless.

■■■ Appellants claim prejudicial error in the trial court's denial of their motion in limine, whereby they sought to suppress any testimony by State's witnesses that Clayton had made statements to the effect that the injury to his nose was the result of an automobile collision and the other driver had paid him $2,000 not to report the accident. Clayton relies on *State v. Pedde,* 334 N.W.2d 41 (S.D.1983) and *State v. Johnson,* 316 N.W.2d 652 (S.D.1982), for the proposition that other crimes evidence is admissible for the purpose of identity only to show modus operandi. Appellants have misunderstood our holdings in those cases. In *Pedde,* we said that we had recognized in *Johnson,* "that evidence of other crimes is *frequently* admissible for purposes such as showing identity where the incidents are close in time and similar in modus operandi." 334 N.W.2d at 43 (emphasis added).

That is not to say that one can show identity *only* through modus operandi.

■ Our standard of review, as to admission of other acts evidence, is whether the court abused its discretion in admitting the evidence. *State v. Dokken*, 385 N.W.2d 493 (S.D.1986). In this instance there does not appear to be any bad acts evidence. The witnesses did not testify that Clayton had actually committed any bad act. They only testified that Clayton told them what he had done, and this testimony was clearly relevant to their testimony identifying Clayton as having been in the Stacey Drug Store at the time in question, a fact appellants hotly contested. Appellants do not seem to argue relevance, but rather they stress the prejudice occasioned by such testimony. Of course it is prejudicial. Most everything that State puts into evidence is meant to be prejudicial. The question is, is it unfairly prejudicial? As we have said in the past "[b]alancing probative value of evidence against risk of unfair prejudice is a delicate function of the trial judge in the exercise of discretion." *State v. Cady*, 422 N.W.2d 828, 829 (S.D. 1988); *State v. Wedemann*, 339 N.W.2d 112, 115 (S.D.1983); SDCL 19–12–3. "The trial judge has wide discretion in determining the prejudicial effect of a witness' statements, and it is only when this discretion is clearly abused that this court will overturn a decision." *Cady, supra; State v. Farley*, 290 N.W.2d 491, 494 (S.D.1980). In short, Clayton seemed to be trying to impress himself upon those around him in the store that day. There is no unfair prejudice arising from the admission of the testimony.

■ We next examine appellants' argument that the trial court erred in admitting certain evidence. First, the record discloses that sufficient foundation was laid for the admission of the following items: the pawn tickets (the shop owner testified that he saw Dorothy sign them), the insured mail receipts (the Faulk County Sheriff saw Clayton attempting to destroy them), the packaging materials from Kent, Washington (these were related to the receipts through their identifying numbers), and the Black Hills Gold rings recovered from the pawn shop (the pawn broker identified them and we deem them to be of a substance that is not readily susceptible to alteration). We find the foundations laid for the various exhibits sufficient to comply with SDCL 19–17–1.[2] Regarding appel-

---

**2.** SDCL 19–17–1 provides:

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this section:

(1) Testimony of a witness with knowledge that a matter is what it is claimed to be.

(2) Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

(3) Comparison by the trier of fact or by expert witnesses with specimens which have been authenticated.

(4) Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

(5) Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

(6) Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if

(a) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or

(b) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

(7) Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept.

(8) Evidence that a document or data compilation, in any form,

(a) is in such condition as to create no suspicion concerning its authenticity,

(b) was in a place where it, if authentic, would likely be, and

(c) has been in existence twenty years or more at the time it is offered.

(9) Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

(10) Any method of authentication or identification provided by a statute or by other rules

lants' claim that the chain of custody was flawed because there was no showing how the packages got from Aberdeen to Kent, we point out that "[t]he 'chain of custody' rule, requir[es] the prosecution to account for the whereabouts of physical evidence connected with a crime from the time of its seizure to its offer at trial[.]" *State v. Serl*, 269 N.W.2d 785, 789 (S.D.1978). In *Serl*, we further said that it was not necessary to establish an absolutely perfect chain of custody, but rather one which strongly suggests the exact whereabouts of the exhibits during that period of time.

▮▮▮ With respect to the admission of the testimony of Sharon Stacey, one of the owners of Stacey Drug, as to the value of the jewelry, we find no error. In *State v. Davis*, 401 N.W.2d 721 (S.D.1987), we held that opinion testimony of the owner of stolen goods, not otherwise an expert, is admissible to establish the value of the stolen goods. Sharon testified she had bought and sold Black Hills Gold jewelry for twenty-two years, during which period she had always used the Landstrom's price list. She also testified that during such transactions she was a willing seller to a willing buyer. We find that to be an adequate foundation for the use of the Landstrom's price list for her valuation testimony. Furthermore, we find no prejudice to appellants. The State is required to prove the value beyond a reasonable doubt. *Davis* supra; *State v. Jacquith*, 272 N.W. 2d 90 (S.D.1978). The relevant valuation involves the $200 floor set in the Grand Theft statute, SDCL 22–30A–17(1). Thus, unless the value is close to that figure, the exact value of the property is not that important. In this instance, the record discloses that Sharon testified the rings had a cumulative retail value of $1,841.00 and a wholesale value of $920.50. We find the jury had sufficient evidence before it to find that the value exceeded $200.00.

With respect to appellants' argument that the trial court erred in instructing the jury on aiding and abetting, since they were charged only as principals, we find that issue to be determined by long-stand-

ing case law. *State v. Zemina*, 87 S.D. 291, 206 N.W.2d 819 (1973); *State v. Johnson* 272 N.W.2d 304 (S.D.1978); *United States v. Thomas*, 469 F.2d 145, *cert. denied* 410 U.S. 957, 93 S.Ct. 1429, 35 L.Ed.2d 690 and 410 U.S. 957, 93 S.Ct. 1430, 35 L.Ed.2d 690 (1973). The case of *State v. Alexander*, 313 N.W.2d 33 (S.D.1981), upon which appellants rely, is wholly distinguishable.

▮▮▮ Clayton's argument that his conviction under the Part II information was fatally flawed because of the manner of the filing of the informations and that the trial court erred in permitting amendment to the Part II information, after the conviction in the underlying offense, is likewise determined adversely to Clayton on the basis of settled South Dakota law. The dismissal and refiling of the underlying charge so the Part II information could be properly filed has been approved by this court in *Halverson v. State*, 372 N.W.2d 463 (S.D.1985). This court has also held that the State may amend an information where the defendant is not prejudiced thereby. *State v. Loop*, 422 N.W.2d 420 (S.D.1988); *State v. Graycek*, 368 N.W.2d 815 (S.D.1985); *State v. Layton*, 337 N.W. 2d 809 (S.D.1983); *State v. Garritsen*, 302 N.W.2d 409 (S.D.1981). The addition of two names to the information is a matter of judicial discretion and Clayton does not point to any particular prejudice, nor does he point to any prejudice by the trial court permitting amendment of the information to correct the date of one of the convictions by one day, likewise a matter of judicial discretion.

In light of our discussions of the various issues above, we deem it redundant to discuss the issues raised on the various motions for directed verdict of acquittal and motions for new trial. We affirm the trial court on those.

▮▮▮ Finally, we determine that the trial court did not abuse its discretion in denying Dorothy's motion to continue the sentencing hearing to permit her to present evidence in mitigation. The sentencing hear-

prescribed by the Supreme Court pursuant to statutory authority.

ing was held nearly four weeks after the trial. On the date of the hearing, Dorothy sought the continuance in order to present letters and affidavits from family members which she had requested of them only the day before the hearing. The determination of whether to grant a continuance is in the sound discretion of the trial court and there is no error unless a manifest abuse of discretion is shown. *State v. Bittner*, 359 N.W.2d 121 (S.D.1984). In making this determination, the trial court may consider whether the party seeking the continuance has exercised diligence in attempting to procure the evidence. *State v. Fleming*, 223 Neb. 169, 388 N.W.2d 497 (1986); *Bowie v. State*, 85 Wis.2d 549, 271 N.W.2d 110 (1978).

We affirm the judgments of conviction in each of the appeals.

WUEST, C.J., and SABERS and MILLER, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

### CONSTITUTIONAL PRINCIPLES APPLY TO "GUILTY" AND "INNOCENT"

A careful review of the briefs and record in this case supports this conclusion: That these Appellants did not receive a fair trial as guaranteed to them by the Fourth (freedom from unreasonable search and seizure), Sixth (fair trial and effective counsel), and Fourteenth (due process) Amendments to the United States Constitution and the equivalent provisions of our state constitution. Therefore, I respectfully dissent.

It is worthy for us, in our deliberations of this case, to reflect thoughtfully on these words and put them into practice:

The procedural safeguards mandated in the Framers' Constitution are not admonitions to be tolerated only to the extent they serve functional purposes that ensure that the "guilty" are punished and the "innocent" freed; rather, every guarantee enshrined in the Constitution, our basic charter and the guarantor of our most precious liberties, is by it endowed with an independent vitality and value, and this Court is not free to curtail those constitutional guarantees even to punish the most obviously guilty.

*Stone v. Powell*, 428 U.S. 465, 524, 96 S.Ct. 3037, 3066, 49 L.Ed.2d 1067, 1105 (1976) (Brennan and Marshall, JJ., dissenting). The substance of the above quotation has since been adopted by the United States Supreme Court: "The constitutional rights of criminal defendants are granted to the innocent and the guilty alike." *Kimmelman v. Morrison*, 477 U.S. 365, 380, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305, 322 (1986).

### APPELLANTS SEIZED WITHOUT PROCESS; THEIR CHILDREN NABBED

In this case, the Appellants were seized from their car and Clayton Iron Necklace was placed in handcuffs. They were transported to Faulkton, thence to Aberdeen.[1] There they were held overnight without charges and their children were likewise seized from them and placed in foster care. Foster care means that the State was holding these children so that the mother and father did not have their care and custody.[2] The police did not decide to "formally" (as Deputy Albright put it) arrest the defendants until the following day, after further investigation. The initial detention was without probable cause, and the State's physical evidence, consisting of jewelry in Washington, pawn shop tickets, and post office stubs, should have been suppressed as "fruits of the poisonous tree" under *Wong Sun v. United States*, 371 U.S. 471,

1. Redfield, Faulkton, and Aberdeen are cities located in the northeastern part of South Dakota; Gettysburg is a more centrally located city in this state.

2. These children were taken from the parents without process and without any petition to any juvenile judge. This is rather reminiscent of the actions of the Nazi party in Germany which thrust, ultimately, the world into World War II. *See State v. Peterson*, 407 N.W.2d 221, 225 n. 1 (S.D.1987) (Henderson, J., dissenting), where I decried the use of public officials "holding" people without benefit of observing their constitutional rights.

484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453 (1963), wherein the United States Supreme Court held that "[t]he exclusionary prohibition extends as well to the indirect as the direct products of such [Fourth Amendment] invasions." The timing of the "formal" arrest, after probable cause was established, does not save the State's case, as an investigatory seizure, made without probable cause, that is the functional equivalent of an arrest, can taint evidence subsequently obtained by the police. *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). *Dunaway,* building on *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (Fourth Amendment protection extends to investigatory seizures), and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) ("arrests" for investigatory purposes on less than probable cause violate Fourth Amendment) provided that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway,* 442 U.S. at 216, 99 S.Ct. at 2258, 60 L.Ed.2d at 838. Given the scale of the police intrusion on the Appellants' freedom in this case, the requirement of probable cause must be satisfied from Appellants' seizure, not the moment of formal arrest. Examination of the facts dispels the notion that probable cause existed on September 11, 1986.

## FACTS DO NOT ESTABLISH PROBABLE CAUSE

Turning to the facts which the police had available at the time of their seizure of Appellants, the record in this case does not indicate what information the deputies had when they stopped and seized the Appellants. This alone might be enough to reject the trial court's finding that probable cause existed, for the reasonableness of a search and seizure, under the Fourth Amendment, is to be judged against the facts available to the officer at the moment of the seizure or search. *Terry v. Ohio,*

392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Even if we proceed on the assumption that they received and relied upon all the information possessed by Deputy Albright in Aberdeen, a finding of probable cause still must fail because Albright's information was insufficient to link the defendants to the theft of rings in Redfield. While police officers may act on the basis of police radio bulletins or information from other officers, once the defendant challenges the police action, the State must demonstrate that the sender or sending agency possessed the requisite knowledge to justify the police action. *See People v. Landy,* 59 N.Y.2d 369, 374–75, 465 N.Y.S. 2d 857, 860, 452 N.E.2d 1185, 1188 (1983). *See also Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306, 313 (1971). Albright, we are told by the majority, noticed "striking similarity between the general descriptions" of suspects in the Redfield theft and the Gettysburg bulletin, yet his testimony at the suppression hearing indicates that little physical information was provided by the Gettysburg authorities. How "striking" can a "general" description be?

Albright knew that a vaguely described white woman and an Indian male, accompanied by two young children, may have been involved in a theft of Black Hills Gold rings in Redfield, and that Dorothy Iron Necklace was in an orange Capri near Gettysburg on that day with a vaguely described Indian male and two young children. Clayton Iron Necklace, who was not mentioned by the Gettysburg police as even being in the Capri (they identified the Indian as a Robert Smith), provided the essential bridge in Albright's decision by having been reported as pawning unspecified jewelry at an unspecified time in Mobridge.[3] (Neither pawning jewelry nor presence in Mobridge is illegal.) With the information Albright had from the police in Redfield, virtually any white woman with an Indian male and children could have been involved in the theft. The majority opinion itself refers to the vast land area involved in this

---

**3.** Mobridge is a city located in north-central South Dakota.

case. Albright's decision was based, essentially, on suspicion, but probable cause cannot be based on mere suspicion, as the United States Supreme Court noted in *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The police detention was, therefore, illegal, and the evidence attained therefrom was tainted. This taint obviously affects the mail stubs, found in the wastebasket, the identification by the postal worker, and the rings located in Washington, as no attenuation of this evidence's causal link to the illegality or claim of "independent source" is credible on these facts. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963); *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). The other eyewitness identifications were facilitated by the "booking" photos considered later in this writing, which photos themselves were fruits of the illegal detention. The remaining evidence, the pawnshop identification and the rings pawned there, is also tainted by the booking photos and if admitted, might not have produced a conviction. Reversal was warranted on Fourth Amendment grounds alone.

DUE PROCESS RIGHTS VIOLATED BY IMPERMISSIBLE SUGGESTIVE PROCEDURES IN IDENTIFICATION OF BOTH DEFENDANTS

### A.

Any identifications by the witnesses at either the post office, Stacey Drug, or the pawn shop resulted from an illegal arrest—due to absence of probable cause—and thus a violation of Fourth Amendment rights took place. *State v. Gage,* 302 N.W. 2d 793 (S.D.1981). In *Gage,* this Court held that certain pretrial photographic and lineup identifications were inadmissible evidence because they were products of an arrest without probable cause. Inasmuch as the trial court erred in determining there was probable cause, the trial court compounded its error in not holding these identifications to be a violation of Fourth Amendment rights.

### B.

Assuming, arguendo, that there was probable cause, these Appellants' rights were violated when their identification by the State's witnesses resulted from suggestive "booking" photographs, thus creating a substantial likelihood of misidentification. Any in-court identifications were tainted by the impermissibly suggestive method and manner of the dual "booking" photos.[4]

When identification is unnecessarily suggestive, and when there is a substantial likelihood of misidentification, an identification denies a defendant due process. *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *State v. Reiman,* 284 N.W.2d 860 (S.D.1979). In *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the United States Supreme Court condemned the practice of showing a single photograph for purposes of identification. The trial court erred in permitting this evidence (identification) to go into evidence in light of the United States Supreme Court's condemnation of such a procedure.

Here, the State concedes that law enforcement officers only displayed photos to four witnesses depicting the Appellants while in the process of being "booked" at the Brown County Sheriff's Office. This revelation of a dual photograph depicted Mr. and Mrs. Iron Necklace under arrest. No other photographs were shown to these witnesses. Mr. Iron Necklace is an Indian; Mrs. Iron Necklace is a white woman with quite long hair. This was an obviously illegal identification procedure. Once this conclusion is established, the proof shifts to the State to then prove by clear and convincing evidence that the in-court identification had an independent origin. If the in-court identification had an independent origin, it is admissible *providing* the clear and convincing platform of proof is established.

---

**4.** These booking photos included numbers, like prison photos, under each Appellant. The individual photos of the Appellants were mounted side by side. This procedure intentionally honed in on these two Appellants.

This rule of proof was established, so far as this Court is concerned, in *State v. Sahlie*, 90 S.D. 682, 245 N.W.2d 476 (1976). There was no trial court determination of the clear and convincing proof requirement. Therefore, stare decisis demands reversal.

Displaying a single photograph, for purposes of identification, has been consistently held as being unnecessarily suggestive. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Reiman*, 284 N.W.2d 860. A so-called "lineup procedure" never took place; it was a display of "booking photographs." The State's attempt to rationalize this procedure into a "totality of the circumstances" test under *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), is preposterous.

Let us consider these facts, supported by the trial record:

(1) Witness Foresman actually testified that Mrs. Iron Necklace was concerned with minding the children when she was in his pawn shop and that it actually could have been some other female who signed the pawn tickets;

(2) The owner, witness Stacey, unqualifiedly testified that she could not identify Mrs. Iron Necklace;

(3) Not one witness, at Stacey Drug, actually saw any person take the jewelry;

(4) The witnesses could only collectively recall that a white person and an Indian person were in the shop;

(5) Witness Dosch had absolutely no conversation discourse or conversation with Mrs. Iron Necklace and observed her for only a minute or two;

(6) Witness Newman talked to Mrs. Iron Necklace briefly when asked for animal supplies and when aspirin was brought over;

(7) Witness Newman was asked if she had any other opportunity to observe Mrs. Iron Necklace and she testified that yes, she did, when she saw her at another hearing in court;

(8) Startling fact: Witness Newman is married to the sheriff of Spink County and discussed Mrs. Iron Necklace's case with him and this is borne out by the transcript record at page 615;

(9) Witness Jessen could only remember a white woman with sandy blond hair and glasses; she testified that she did not speak with Mrs. Iron Necklace and this was all she could really recall about the white woman; and

(10) The police showed a booking photo of an Indian male and a white woman together, permitting the witnesses to make an inductive leap that the two (as depicted in the photograph) were together and in the store (after all, they have numbers on the pictures reflecting that they are regular convicts or prisoners).

Conclusion: These identifications are totally inadequate and do not comply with the factors set forth for reliability of identification. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972). I am overwhelmed with the fact that these witnesses, *after* the constitutionally infirm lineup took place (only single booking photographs shown), had an opportunity to see the Iron Necklaces at preliminary hearings, suppression motions, and other hearings held prior to trial. In other words, the prosecution started out with a tainted, wrongful procedure; then, as each hearing was held, could shore up the witnesses in their identification. My point is simple: This impermissibly suggestive photo lineup deprived the Iron Necklaces from their due process rights and the tainted in-court eyewitness identifications did not eliminate the constitutional transgressions.

### PROSECUTORIAL MISCONDUCT

In *State v. Havens*, 264 N.W.2d 918 (S.D. 1978), this Court observed:

We must however remind prosecutors that it is the foundation of the criminal justice system to see that the defendant and every defendant gets his day in court and a fair trial. This burden weighs as heavily on prosecutors as it does on judge, jury and defense counsel.

*Havens,* 264 N.W.2d at 923 (footnote omitted). "The prosecutor's overriding obligation is to see that the defendant receives a fair trial." *State v. Ashker,* 412 N.W.2d 97, 104 (S.D.1987) (citing *State v. Sahlie,* 90 S.D. 682, 688, 245 N.W.2d 476, 479 (1976), and *State v. Gage,* 302 N.W.2d 793, 797 (S.D.1981)). A prosecutor's duty is not simply to prosecute, but to obtain justice with a fair trial. *State v. Brandenburg,* 344 N.W.2d 702, 705 (S.D.1984). Attempts by prosecutors to use disingenuous trial tactics which have the effect of endangering or obviating a defendant's right to a fair trial are decried by this Court. *See State v. Kidd,* 286 N.W.2d 120, 121 (S.D. 1979).

In this case, the prosecutor was playing strictly to win, sidestepping the defendant's constitutional right to a fair trial. The prosecutor, despite defendants' request for discovery on September 26, 1986, provided a list of eight additional witnesses, not listed on the indictments or information (Clayton), on Friday, January 23, 1987, three business days before trial was to begin. On January 26, 1987, the prosecutor refused to provide defendants with the substance of Kristina Jessen's testimony (Jessen was one of the witnesses on the newly revealed witness list).[5] On Tuesday, January 27, 1987, Jessen refused to talk to defense counsel, telling them that the State's Attorney told her not to talk to them (the prosecutor denied this, telling the trial court that she had told Jessen that it was Jessen's choice, although she, the prosecutor, did not want Jessen to talk to defense counsel). This record of evasion was sufficient to merit reversal, as Jessen's testimony placed Dorothy Iron Necklace in close proximity to the stolen rings. Given the wealth of unconstitutionally admitted evidence admitted in this case, tainted by a lack of probable cause (see above) this misconduct was not harmless.

The discovery statutes are there to eliminate trial by ambush. Discovery, to be meaningful, must ordinarily be as far in advance as is possible (within practical time constraints) to permit the accused an opportunity to investigate the evidence which is damning to his innocence, or to discover evidence that is helpful to his cause. The trial courts of this state must breathe a vibrant life into the criminal discovery statutes lest disclosures be so tardy that defense counsel is availed little time to prepare his case.

*State v. McKee,* 314 N.W.2d 866, 869 (S.D. 1982) (Henderson, J., concurring specially). The late disclosure, and subsequent evasions by the prosecutor in this case, deprived the Iron Necklaces of fair trial. Simply put, the prosecutor did everything within her power to prevent her adversary from being fairly prepared.[6] Is this justice? In *Taylor v. Illinois,* 484 U.S. ——, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), the United States Supreme Court approved the sanction of precluding a defense witness from testifying when the defendant violated discovery rules. The same should have been done here. Defense counsel made a motion to strike Jessen's testimony: Denied. Defense counsel moved for mistrial: Denied. Defense counsel made a motion, prior to these motions, that Jessen not be permitted to testify: Denied. *After* the trial began, the court permitted counsel to talk to Jessen. My opinion: Too late! Unfortunately, at this juncture, it was a faint piccolo, and not a trumpet for timely justice.

---

5. Another written request for witnesses was submitted to the State's Attorney on December 8, 1986.

6. What, pray tell, does a new list of the State's witnesses mean to a defense lawyer about to go into the courtroom—when he has no idea what they are going to say?